**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

THE TALARIA COMPANY, LLC &
MORRIS YACHTS, LLC,

     *Plaintiffs*,

     v.

MICHAEL DUPLESSIE *et al.*,

     *Defendants*

Case No. 23-cv-468-ABA

### MEMORANDUM OPINION

Plaintiffs Talaria Company, LLC d/b/a Hinckley Yacht Service ("Hinckley") and Morris Yachts, LLC ("Morris") (collectively, the "Plaintiffs") have sued defendants Michael Duplessie, Classic Sailboats, Ltd., and Bayshore Management LLC (collectively, the "Defendants") for trademark infringement, breach of contract, cybersquatting, and defamation. The claims arise from an alleged campaign by Defendants to attack Plaintiffs with false, misleading, and defamatory statements after Duplessie took his boat in for repairs, was unsatisfied with the work, and did not want to pay the repair bill.

Duplessie is representing himself, *pro se*. No counsel has entered any appearance on behalf of any of the entity plaintiffs (as required with respect to entity parties other than sole proprietorships). The Court held a default judgment hearing on November 7, 2024, at which no Defendant appeared. For the reasons explained below or in the accompanying order, the default is vacated as to Duplessie, but Plaintiffs are entitled to a default judgment against Classic Sailboats and Bayshore Management, as well as other temporary injunctive relief against Duplessie. A raft of other motions Duplessie has filed, including a motion to dismiss, will be denied.

## FACTUAL BACKGROUND

At this stage, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). That standard applies both to Duplessie's motion to dismiss, *id.*, as well as to Plaintiffs' motion for a default judgment (at least with respect to the entity defendants, who have not properly appeared[1]). Plaintiffs allege as follows.

 Hinckley is a Delaware limited liability company "in the business of designing, manufacturing, distributing, servicing and repairing luxury sails and powerboats." ECF No. 14 ("Am. Compl.") ¶ 6, 14. As part of its business, Hinckley operates two service yards in Maryland, one in Annapolis and one in Easton, providing "extensive maritime repair services as well as a full-service marina, and storage and related marine services for both Hinckley and non-Hinckley vessels." *Id.* ¶ 15.

Hinckley owns several federal trademark and service mark registrations for the trademark and service mark HINCKLEY in connection with its products and services. *Id.* ¶ 16(a)-(d). Hinckley also owns a separate federal trademark for the below logo:

---

[1] As noted above, Duplessie is representing himself in this case. He has purported to make various filings on behalf of Classic Sailboats, Ltd. and Bayshore Management LLC. But Local Rule 101(a) requires that, for civil cases, "[a]ll parties other than individuals must be represented by counsel." *See also Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202 (1993) (providing that "all artificial entities," including "corporations, partnerships, or associations," must "appear in federal court . . . through a licensed attorney"); *Davis v. Uhh Wee, We Care, Inc. et al.*, 17-cv-494-SAG, 2020 WL 5593005, at *1, n.2 (D. Md. Sept. 18, 2020) ("The Clerk's Entry of Default against the named corporate defendants remains valid because" a *pro se* litigant "cannot represent the [corporate defendants].").



*Id.* ¶ 16(e).

Hinckley has continuously used its registered marks and other unregistered trademarks (collectively, "Hinckley's Trademarks"), such as HINCKLEY YACHTS, HINCKLEY YACHT SERVICES, and SILENTJET, both in Maryland and in various geographic areas in which Hinckley operates. *Id.* ¶ 19. Hinckley has invested "many millions of dollars over the years to promote and advertise its products and services" using Hinckley's Trademarks, *id.* ¶ 22, and "has established considerable goodwill and recognition" as a result. *Id.* ¶ 23. Hinckley also owns and operates the domain name https://www.hinckleyyachts.com "to promote its various products and services." *Id.* ¶ 21.

Morris, an entity related to Hinckley, is a Delaware limited liability company "in the business of designing, manufacturing, and distributing, luxury sailboats." *Id.* ¶¶ 7, 8, 25. Morris builds yachts to order, customized to individual customer needs. *Id.* ¶ 25. Morris owns the federal trademark and service mark registration for the trademark and service mark MORRIS YACHTS in connection with its products and services. *Id.* ¶ 26(a). Morris also owns a separate federal registration for the below logo:



*Id.* ¶ 26(b).

Morris has continuously used its registered marks (collectively, "Morris's Trademarks") both in Maryland and in various geographic areas in which Morris operates. *Id.* ¶ 29. Morris has invested "substantial financial resources over the years to promote and advertise its products and services" using Morris's Trademarks, *id.* ¶ 31, and "has established considerable goodwill and recognition" as a result. *Id.* ¶ 32. Morris also owns and operates the domain name https://www.morrisyachts.com "to promote its various products and services." *Id.* ¶ 30.

Michael Duplessie is a Maryland resident and allegedly the sole member of Bayshore Management, a Wyoming limited liability company with its principal office in Bethesda, Maryland. *Id.* ¶¶ 9-10. As of October 2021, Bayshore Management has been administratively dissolved. *Id.* ¶ 10. Duplessie is also allegedly the sole shareholder of Classic Sailboats, a limited company incorporated in Nevis with its principal office in Bethesda, Maryland. *Id.* ¶ 11. Duplessie and Bayshore Management jointly owned a 33' Hinckley recreational vessel known as "PRESSURE DROP" or "CAPELLA" (the "Vessel"). *Id.* ¶ 12. At least as of the date the amended complaint was filed (June 13, 2023), the Vessel was located at Hinckley's service yard in Easton, Maryland, *id.*, and as far as the Court knows, it is still located there.

In or around October 2020, Duplessie brought the Vessel to Hinckley's facility in Easton, Maryland for winter storage and repairs. *Id.* ¶ 34. From October 2020 through November 2021, Duplessie "requested and/or authorized extensive equipment upgrades and repairs to the Vessel" such as "removing and replacing pumps and fuel lines, refitting the head, replacing sea cocks, replacing and sealing unused thru hulls, painting and varnishing the exterior, replacing rigging, converting wire to rope halyards,

installing new batteries, battery boxes, banks and chargers, refitting the cockpit locker, and extensive engine and transmission work." *Id.* ¶ 35. After the upgrades and repairs were completed, Hinckley provided Duplessie an invoice of $260,002. *Id.* ¶ 36. Duplessie and/or Bayshore Management paid $143,240, leaving $116,762 of the invoice unpaid to this day. *Id.* The parties' dispute over that portion of the repair bill appears to have triggered the disputes in this case.

Sometime in 2022, Duplessie and/or Classic Sailboats registered the domain name and created the website "hinckleyboat.com." *Id.* ¶ 39 (the "Fake Hinckley Website").[2] As of early 2023, the Fake Hinckley Website featured HINCKLEY and HINCKLEY YACHT SERVICES trademarks. *Id.* ¶¶ 39, 41. The Fake Hinckley Website contains several disparaging statements regarding the nature and quality of Hinckley's boats and repair services, including images of boats and yachts ablaze, with captions such as "Brand new Hinckley Talaria 34 burns due to incompetent design and build," or "Man Rescued, Forced to Abandon Burning Sailboat," as well as other statements such as "How many people were murdered for a 1/3rd share of Hinckley Yachts?"; "53 ways to die on a Hinckley yacht"; "Buy a Hinckley and die!"; and "Jerry Lundquist, did you buy Hinckley Yachts and Hunt Yachts with blood money?" *See id.* ¶ 39; ECF No. 1-2. The Fake Hinckley Website also contains several screenshots of emails from Hinckley representatives addressed to "Michael" containing correspondence regarding inspection results and tests run on a vessel, with captions such as "[i]t is not legal for Hinckley Yacht Service to bill for fake tests they only pretended to have done." ECF No. 1-2.

---

[2] At the time of this opinion being filed, the Fake Hinckley Website does not seem to display any of Hinckley's Trademarks.

Also in 2022, Duplessie and/or Classic Sailboats created a Facebook page similarly titled "Hinckley Boats" displaying Hinckley's Trademarks and (falsely) listing its address as the address of Hinckley's service yard located in Easton, Maryland. Am. Compl. ¶ 42. The Facebook page displays similar disparaging language about fraudulent billing, dangers of Hinckley boats, as well as images of t-shirts being sold or offered by Duplessie and/or Classic Sailboats that read "BUY A HINCKLEY AND DIE." *Id.*; ECF No. 1-3. Since then, Duplessie and/or Classic Sailboats have created several other websites, Facebook pages, or Instagram pages containing similar language about Hinckley and using Hinckley's Trademarks. *Id.* ¶¶ 43-44.

Duplessie's campaign moved from the internet to alleged in-person disparagement in October 2022, when he "staged a 'protest' outside of the Annapolis Boat Show" where he distributed materials packaged with labels such as "Putting your family's life at risk," Hinckley yachts are "death ship[s]," "53 Ways to Die," and Hinckley is "A Cancer on Classic Yachts." *Id.* ¶ 49. At a 2022 boat show in St. Michael's, Maryland, Duplessie made the same statements to various prospective Hinckley customers, and "Hinckley employees [present at the boat show] were forced to defend against Duplessie's" statements. *Id.* ¶ 50.

In 2023, Duplessie and/or Classic Sailboats created similar pages using Morris's Trademarks. *Id.* ¶ 45. Duplessie and/or Classic Sailboats registered the domain name and created the website "morrisyacht.com." *Id.* (the "Fake Morris Website").[3] As of 2023, the Fake Morris Website contained both the HINCKLEY and MORRIS marks, and

---

[3] At the time of this opinion being filed, the Fake Morris Website does not seem to display any of Hinckley's Trademarks or Morris's Trademarks.

named certain individuals related to Plaintiffs as being "bought with blood money,"
while displaying a photograph of dead bodies. *Id.* ¶ 46.

Also in 2023, Duplessie and Classic Sailboats registered several other domain
names containing similar language about individuals with ownership interests in
Plaintiffs. *Id.* ¶ 47. Duplessie and Classic Sailboats also sent emails to Hinckley
customers and individuals associated with Hinckley containing similar allegations,
"including allegations of participating in war crimes." *Id.* ¶ 48.

## PROCEDURAL HISTORY

On February 22, 2023, Plaintiffs filed a complaint against the Defendants, ECF
No. 1, and on June 13, 2023, Plaintiffs amended the complaint. *See* ECF No. 1 (original
complaint); ECF No. 14 (amended complaint). All Defendants were initially served with
the summons and amended complaint on June 30, 2023. ECF No. 16. Plaintiffs also
separately served Classic Sailboats with the summons and amended complaint via
registered mail to its resident agent in Nevis on August 18, 2023. ECF No. 17.
Responsive pleadings from Duplessie and Bayshore Management were due by July 21,
2023, and a responsive pleading was due from Classic Sailboats by September 8, 2023.
On September 15, 2023, after no responsive pleadings were filed by Defendants,
Plaintiffs filed a Request for Entry of Default. ECF No. 18. The Clerk entered defaults
against Defendants on September 18, 2023, and notices of default were issued the same
day. ECF Nos. 19-22.

On December 1, 2023, Plaintiffs filed a Motion for Default Judgment as to all
three Defendants. ECF No. 27. The Motion for Default Judgment specifically seeks
default judgment on Count I (Trademark Infringement), Count V (Cybersquatting),
Count VII (Breach of Contract), and Count XI (Defamation). ECF No. 27-1 at 31.

Plaintiffs further state that, in the event default judgment is granted on those counts, Plaintiffs would "voluntarily dismiss the remaining counts asserted in the Amended Complaint without prejudice so that final judgment may enter pursuant to Fed. R. Civ. P. 58." *Id.*

Over the course of several months in early 2024, Duplessie submitted certain notices and filings to the Court, all of which were stricken per Judge Griggsby's April 17, 2024 Order, ECF No. 40, for failing to comply with her previously entered Case Management Order, ECF No. 4. The Order also required Defendants to file any response to the motion for default judgment on or before May 1, 2024. ECF No. 40. Having not responded to the motion for default judgment, Duplessie submitted several motions for continuance, ECF Nos. 43 and 47. This case was reassigned to the undersigned on September 19, 2024. This Court issued an order on September 23, 2024, denying Duplessie's pending motions for continuance, setting a deadline for Defendants to respond to Plaintiffs' default judgment motion by October 11, 2024, and setting a default judgment hearing. ECF No. 48.

The night before the hearing, Duplessie filed a motion to dismiss the complaint, ECF No. 49, and a response brief to the motion for default judgment, ECF No. 50. The Court held the hearing on November 7, 2024. ECF No. 53. No Defendant appeared, including Duplessie. Right after the hearing, on November 7, 2024, Duplessie filed an "Emergency Motion for Continuance Due to Medical Emergency" citing an "unexpected medical emergency" as the reason for his absence. ECF No. 54.

Since the hearing, Duplessie has submitted several lengthy filings and motions in this case.[4] On November 12, 2024, Duplessie filed (1) a Motion for Leave to File an Amended Complaint (which this Court construes as an answer), ECF No. 55, (2) a Motion for Sanctions, ECF No. 56, (3) and an Amended Answer, containing Duplessie's affirmative defenses and counterclaims against Plaintiffs. ECF Nos. 57, 58.[5] On November 17, 2024, Duplessie filed (1) a Motion to Vacate Default Judgment (which this Court construes as a motion to vacate the *entry* of default), ECF No. 59, and (2) a Motion to Dismiss Improper Defendants (which this Court construes as a supplemental motion to dismiss), ECF No. 60.

Plaintiffs filed timely responses to Duplessie's motions. ECF Nos. 62-66. Plaintiffs also moved to strike the answers Defendants had filed (or purported to file) because (1) insofar as they were filed on behalf of entity defendants, they were invalid because those defendants cannot proceed *pro se*, and (2) insofar as they were filed on behalf of Duplessie, they "should be stricken because he remains in default." ECF No. 67 at 2. On December 3, 2024, Duplessie filed a Motion for Continuance and replied to Plaintiffs' opposition briefs. ECF Nos. 69-72. He amended some of his reply briefs on December 4 and 5, 2024. ECF Nos. 74-75.

---

[4] Duplessie purports to be filing *pro se* on behalf of Classic Sailboats and Bayshore Management for several filings on this docket. However, as noted above, under Local Rule 101.1(a), "[a]ll parties other than individuals must be represented by counsel." Counsel has not made an appearance for either Classic Sailboats or Bayshore. Therefore, all filings in this case made by "Defendants" shall be construed to be filings made by Duplessie only.

[5] Duplessie filed two "Amended Answers" simultaneously on November 12, 2024. It is not clear which he intends to be the operative Answer in this case.

## ANALYSIS

I.    **Motion to Vacate Entry of Default (ECF No. 59) as to Duplessie**

"When a party against whom a judgment for affirmative relief is sought has failed
to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the
clerk must enter the party's default." Fed. R. Civ. P. 55(a). A court "may set aside an
entry of default for good cause." Fed. R. Civ. P. 55(c). "[R]elief from a judgment of
default should be granted where the defaulting party acts with reasonable diligence in
seeking to set aside the default and tenders a meritorious defense." *United States v.
Moradi*, 673 F.2d 725, 727 (4th Cir. 1982) ("[T]rial judges are vested with discretion,
which must be liberally exercised, in entering [default] judgments and in providing
relief therefrom.").

The Fourth Circuit has established several factors (known as the "*Payne* factors")
as relevant for determining whether to set aside an entry of default, namely "whether
the moving party has a meritorious defense, whether it acts with reasonable
promptness, the personal responsibility of the defaulting party, the prejudice to the
party, whether there is a history of dilatory action, and the availability of sanctions less
drastic." *Payne ex rel. Est. of Calzada v. Brake*, 439 F.3d 198, 204-05 (4th Cir. 2006).

The sole defendant that has filed a cognizable motion to set aside a default is
Duplessie. (As noted above, any filings that purport to be on behalf of the entity
defendants are not cognizable, as no counsel has entered appearances on behalf of those
defendants. Accordingly, there is no basis to vacate the defaults entered against Classic
Sailboats and Bayshore Management.) As to Duplessie, the Court proceeds to apply the
*Payne* factors to his request to vacate the default entered as to him.

A. **Meritorious Defense**

To establish a meritorious defense, the defaulting party must make a "a proffer of evidence which would permit a finding for the defaulting party or which would establish a valid counterclaim." *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988); *see also Acosta v. Vera's White Sands Beach Club, LLC*, No. 16-cv-782-PX, 2019 WL 1767147, at *2 (D. Md. Apr. 22, 2019) (holding that "[a] defense is meritorious when the defendant makes a factual showing that 'would permit a finding for the defaulting party.'") (internal citation omitted); *Dominion Fin. Servs., LLC v. Pavlovsky*, No. 22-cv-705-JKB, 2022 WL 4631072, at *4 (D. Md. Sep. 30, 2022) (same); *Timilon Corp. v. Empowerment Justice Center Corp.*, No. 23-cv-1134-DKC, 2024 WL 3276319, at *5 (D. Md. July 2, 2024) (same). "The underlying concern is to determine whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." Mary Kay Kane*, The Requirement of Showing a Meritorious Defense*, 10A Fed. Prac. & Proc. Civ. § 2697 (4th ed.).

Whether Duplessie has met this burden differs depending on the claims. As noted above, Plaintiffs have moved for a default judgment only as to the trademark infringement, cybersquatting, breach of contract, and defamation claims. As to some of the claims, Duplessie does not make any serious attempt to suggest that he has a meritorious defense. For example, in response to the cybersquatting claim, Duplessie seemingly admits that he is the one controlling the social media accounts at issue. *See* ECF No. 56 at 2 ("[Plaintiffs] have taken steps to suppress social media criticism of Hinckley Yacht Services by coercing Defendant.").

As to the other claims, however, Duplessie has met the low burden of making allegations that, if he is eventually able to prove them, may constitute a meritorious defense. In particular, with respect to Plaintiffs' breach of contract claim, Duplessie argues that he did not breach his contract with Plaintiffs because Plaintiffs have either inflated the invoice amounts, misrepresented the repairs and inspections completed on the Vessel, and have left the Vessel in worse condition after Duplessie left the Vessel with Plaintiffs in 2022. ECF No. 59 at 2, 3, 5 ("Plaintiffs knowingly inflated invoices and charged for services not performed.").

With respect to the defamation and trademark infringement claims, Duplessie argues (1) he did not make the statements cited in the Complaint; and (2) if he did make any statements, he did not knowingly make any false statements about the Plaintiffs, and these statements are supported by independent inspections done on the Vessel. ECF No. 50 at 3-4 ("[A]ny allegedly defamatory statements would not be attributable to Mr. Duplessie."). The Court need not and does not decide whether they are "meritorious" within the meaning of *Payne*, but notes that, at least at this stage in the proceedings, Duplessie's contentions are largely conclusory and unpersuasive when he attempts to defend the statements that Plaintiffs contend are outrageous, infringing, and defamatory.

In short, as to some of Plaintiffs' claims, this *Payne* factor weighs in favor of Plaintiffs, others slightly in favor of Duplessie. This is not to say that Duplessie has shown a *likelihood* of success on the merits. To the contrary, Plaintiffs' allegations paint a picture of a person who transformed a dispute over a boat repair invoice into a destructive campaign of cybersquatting, trademark infringement, and defamation. But having eventually, if belatedly, appeared to defend himself in this case, the courts'

strong preference that cases be decided on the merits leads this Court to conclude that the default as to Duplessie only should be vacated, and the claims against him proceed to discovery.

B. **Reasonable Promptness**

"[A] party attempting to set aside an entry of default must act with reasonable promptness in responding to the entry of default." *Timilon*, 2024 WL 3276319, at \*6 (quoting *Nat'l Liab. & Fire Ins. Co. v. Rooding*, No. 15-cv-2572-ELH, 2016 WL 5144493, at \*7 (D. Md. Sept. 30, 2022)).

Duplessie asserts that he has "acted with reasonable promptness in the context of his health challenges, demonstrating his intent to respond responsibly to this matter." ECF No. 50 at 5. Duplessie's response to the motion for default judgment was due, after several extensions previously granted by this Court, on October 11, 2024. *See* ECF No. 48. Duplessie waited until the night before the hearing, November 6, 2024, to file a motion to dismiss, ECF No. 49, and response in opposition to the motion for default judgment, ECF No. 50. Duplessie did not file his motion to vacate default judgment until November 17, 2024, more than a year after the Clerk's Office entered default against him, ECF No. 19.

Duplessie further argues that "[t]he Clerk's Office did not mail the October 11, 2024, deadline notice until October 17, 2024, six days after the deadline had already passed, leaving Defendant no meaningful opportunity to respond." ECF No. 59 at 2. This argument holds little weight, however, given that Duplessie consented on January 30,

2024 to receive notice and service electronically.[6] Regardless, it is not clear why Duplessie waited to bring this issue to the Court's attention until November 17, 2024, more than a month after he received the Court's order via mail, and more than a week *after* Duplessie was scheduled to appear for a hearing.

Regardless of Duplessie's alleged ongoing medical issues, the length of time it has taken for Duplessie to submit substantive filings in this case leads this Court to hold the second *Payne* factor weighs in favor of Plaintiffs. *See Consol. Masonry & Fireproofing, Inc. v. Wagman Const. Corp.*, 383 F.2d 249, 251 (4th Cir. 1967) (finding that two and a half months between default being entered and the motion to set aside default being filed was enough for this factor to weigh in favor of Plaintiff); *cf. Acosta*, 2019 WL 1767147, at *2 (finding a delay of two months between entry of default and motion to vacate was reasonable, but there only because plaintiffs were also delayed in submitting filings).

C. **Personal Responsibility of Defaulting Party and History of Dilatory Action**

The third *Payne* factor, personal responsibility of the defaulting party, pertains to whether the defaulting party was personally responsible for the default, and the fifth factor considers whether there is a 'history of dilatory action.' *Colleton Preparatory*

---

[6] Duplessie consented to receive notice and service electronically through this Court's Electronic Document Submission System ("EDSS"). *See* United States District Court for the District of Maryland, *Electronic Document Submission System Administrative Procedures* (April 2022), https://www.mdd.uscourts.gov/sites/mdd/files/EDSS-AdminProcedures.pdf ("By using EDSS, self-represented litigants consent to receive notices of electronic filing by email transmission to the email address provided. Such notice shall constitute service of all items required to be served under Fed. R. Civ. P. 5(a) and 77(d). Paper copies of filed documents will no longer be sent by mail to any litigant using EDSS by either the parties or the Court.").

*Academy, Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010). "In considering personal responsibility, district courts in the Fourth Circuit have found that default judgment 'is reserved only for cases where the party's noncompliance represents bad faith or complete disregard for the mandates of procedure and the authority of the trial court.'" *Timilon*, 2024 WL 3276319, at *7 (quoting *First Am. Fin. Corp. v. Homefree USA, Inc.*, No. 12-cv-2888-ELH, 2013 WL 2902856, at *4 (D. Md. June 12, 2013), *report and recommendation adopted*, No. 12-cv-2888-ELH, 2013 WL 6080178 (D. Md. July 8, 2013) (quoting *Russell v. Krowne*, No. 08-cv-2468-DKC, 2013 WL 66620, at *2 (D. Md. Jan. 3, 2013)).

Duplessie was given personal notice of the entry of default for over a year, and Duplessie has already been found to have "acted to evade services under Md. Rule 2-121(b)." ECF No. 12 at 3; *see Timilon*, 2024 WL 3276319, at *7; *Dominion Fin. Servs.*, 2022 WL 4631072, at *4. As a *pro se* defendant, Duplessie is solely responsible for his own conduct and representation in this case. And although Duplessie asserts that medical reasons prevented him from engaging counsel and filing a response to Plaintiffs' lawsuit, he offers no declaration in support. *See Choice Hotels Intern., Inc. v. Stillwater Joint Venture, LLC*, No. 20-cv-2162-DKC, 2021 WL 5494535, at *2 (D. Md. Nov. 23, 2011) ("A party's own statement, without significant corroboration, is insufficient to overcome the return of service."). For the reasons explained under the second *Payne* factor, the third and fifth factors too weigh slightly in favor of Plaintiffs.

## D. **Prejudice**

In considering the fourth *Payne* factor, prejudice to Plaintiffs, "delay in and of itself does not constitute prejudice to the opposing party." *Colleton*, 616 F.3d at 418. Plaintiffs argue that they will be unfairly prejudiced if default is vacated given that they

"filed this action nearly two years ago" and Duplessie still refuses to "participate meaningfully and substantively." ECF No. 62 at 9. Plaintiffs also explain that they have spent "tens of thousands of dollars litigating collateral matters" while the defamatory statements and websites remain available for the public to view. *Id.*

Plaintiffs' costs associated with litigating the default and the ongoing publication of defamatory statements are addressed below in the last *Payne* factor. But for now, given the Fourth Circuit's preference that cases be decided on the merits, and because the Court is ordering alternative interim relief less drastic than entry of a default judgment, the Court finds this factor weighs slightly in favor of Duplessie.

E.  **Availability of Sanctions Less Drastic**

Courts in the Fourth Circuit have held that sanctions less drastic than final judgment can "include monetary sanctions for the costs of litigating the entry and setting aside [ ] the default order." *Acosta*, 2019 WL 1767147, at *4 (citing *Trs. of Sheet Metal Workers' Local Union No. 5 & Iron Workers Emps. Ass'n, Emp. Pension Tr. v. R. Stoddard, LLC*, No. 17-cv-3286-GJH, 2019 WL 1128518, at *2 (D. Md. Mar. 8, 2019) ("It is an appropriate lesser sanction to award attorneys' fees when a party defaults.")). In *Dominion Fin. Servs.*, the court held that it would have been "inappropriate to excuse behavior as evasive as [defendant's] by allowing him another opportunity to answer [plaintiff's] claims." 2022 WL 4631072, at *4.

Here, however, Duplessie has already submitted filings that answer Plaintiffs' claims. Additionally, Plaintiffs propose alternative sanctions that "any order to vacate default should be conditioned upon the following occurring within 10 days: 1) Duplessie paying all legal fees incurred by Plaintiffs between the date of entry of default; 2) all websites referenced in the Amended Complaint must be suspended and removed from

viewing; and 3) all social media accounts must be suspended and removed from viewing." ECF No. 62 at 10. The Court finds that this is a sufficient, less drastic sanction that will mitigate ongoing prejudice on Plaintiffs, remedy the fees spent litigating as a result of Duplessie's delays, and allow this case to move forward on the merits against Duplessie. As will be explained in the accompanying order, Duplessie shall complete the above and also be enjoined from making the allegedly defamatory statements identified by Plaintiffs to prevent ongoing harm as this case progresses.

*    *    *

The meritorious defense, prejudice, and availability of sanctions less drastic *Payne* factors support vacating entry of default, while the reasonable promptness, personal responsibility, and history of dilatory action factors support leaving the order of default untouched. Because the Fourth Circuit strongly prefers deciding cases on the merits, *Colleton Preparatory Academy, Inc.*, 616 F.3d at 417, the motion to vacate entry of default as to Duplessie only will be granted—but subject to the stringent interim relief and conditions set forth in the order that accompanies this memorandum opinion.

If Duplessie fails to comply with these conditions, that will mean that less drastic relief than default judgment is not adequate, and thus may well result in re-institution of the default against Duplessie and entry of a default judgment—including monetary and injunctive relief—against him.

## II. Motion for Default Judgment (ECF No. 27) as to Classic Sailboats and Bayshore Management

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). After default has been

entered, the party seeking default judgment "must apply to the court for a default judgment," providing sufficient notice to the defaulting party. *Id.* 55(b)(2). Under Federal Rule of Civil Procedure 55(b)(2), "[t]he court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter."

The clerk's entry of default does not entitle the moving party to a default *judgment* as of right. *See* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2685 (4th ed. 2024). Rather, courts have discretion for entering default judgments and granting relief. *Moradi*, 673 F.2d at 727 ("[T]rial judges are vested with discretion, which must be liberally exercised, in entering [default] judgments and in providing relief therefrom."). The Fourth Circuit has a strong preference that "defaults be avoided and that claims and defenses be disposed of on their merits." *Colleton*, 616 F.3d at 417. But "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party[.]" *Choice Hotels Intern., Inc. v. Savannah Shakti Carp.*, No. 11-cv-0438-DKC, 2011 WL 5118328, at *2 (D. Md. Oct. 25, 2011) (citing *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)).

 "Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not." *Lawbaugh*, 359 F. Supp. 2d at 422. Therefore, a court must first determine whether, assuming the factual allegations are true, "the unchallenged factual allegations constitute a legitimate cause of action." *Chevy Chase Funding, LLC v. Walsh*, No. 16-cv-1804-GJH, 2018 WL 3304692, at *3 (D. Md. July 5, 2018) (citing *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md.

2010)). The court must make this determination using the 12(b)(6) *Iqbal/Twombly* pleading standard. *See id.*; *see also Baltimore Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 544 (D. Md. 2011) (holding that *Iqbal* is "relevant to the default judgment inquiry").

Once a court determines that default judgment should be entered, the court must then make a determination regarding relief. Unlike "every other final judgment" of the court, a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Therefore, the court cannot decide to award additional damages than those pled in the complaint "because the defendant could not reasonably have expected that his damages would exceed th[e] amount [pled in the complaint]." *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 132 (4th Cir. 2000). The court may, at its discretion, hold a hearing to determine damages, or look to the evidence in the record to determine the appropriate sum. 10A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2688 (4th ed. 2024).

In addition to damages, a court may issue an order for injunctive relief against a defaulted party if the moving party has requested injunctive relief in the complaint and has shown that injunctive relief is warranted. *See, e.g.*, *El Pollo Rico, LLC v. Wings & Pollo, LLC*, No. 21-cv-2346-PWG, 2022 WL 2916168, at *2 (D. Md. July 25, 2022) (issuing a permanent injunction for violations of the Lanham Act); *Entrepreneur Media, Inc. v. JMD Entm't Grp., LLC*, 958 F. Supp. 2d 588, 596 (D. Md. 2013) (same); *Guo Wengui v. Hongkuan Li*, No. 18-cv-0259-PWG, 2019 WL 2288348, at *3 (D. Md. May 29, 2019) (issuing a permanent injunction for defamation claims); *Disney Enters. v. Delane*, 446 F. Supp. 2d 402, 405-06 (D. Md. 2006) (granting a permanent injunction on default judgment).

Default was entered against Classic Sailboats and Bayshore Management on September 18, 2023. Neither Classic Sailboats nor Bayshore Management has had counsel make an appearance in this case or submit any filings. For the reasons stated below, the Court hereby grants Plaintiffs' motion for default judgment as to Classic Sailboats and Bayshore Management as to Counts I, V, VII, and XI.

### A.    Count I (Trademark Infringement)

In Count I, Plaintiffs allege a claim of trademark infringement against Duplessie and Classic Sailboats. Am. Compl. ¶¶ 56-59. A plaintiff alleging causes of action for trademark infringement and unfair competition must prove "(1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred 'in commerce'; (4) that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers." *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114, 1125(a) and *Lone Star Steakhouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 930 (4th Cir. 1995)); *see also Fairbanks Capital Corp. v. Kenney*, 303 F. Supp. 2d 583, 589 (D. Md. 2003).

Plaintiffs have sufficiently alleged that they own the two HINCKLEY and MORRIS marks at issue in this case. Am. Compl. ¶¶ 16, 26. Plaintiffs have also plausibly alleged that Classic Sailboats used the HINCKLEY and MORRIS marks on their various websites. *Id.* ¶¶ 39-46. In addition, Plaintiffs have alleged that Classic Sailboats appeared to offer the sale of certain merchandise using the HINCKLEY and MORRIS marks, such as water bottles or t-shirts. *Id.* ¶¶ 42(a), 43, 49, & 102. This leaves the "in commerce" and "likelihood of confusion" elements.

###### i.    In commerce element

Courts have applied varying standards in determining whether an alleged infringer used a trademark "in commerce" for purposes of the Lanham Act and trademark infringement requirements. While the Fourth Circuit traditionally requires goods to actually be "sold or transported in commerce," *see Combe Inc v. Dr. August Wolff GmbH & Co. KG Arzneimittel*, 309 F. Supp. 3d 414, 420 (E.D. Va. 2018), *aff'd* 851 F. App'x 357 (4th Cir. 2021), courts have generally held that, in the context of trademark usage on the Internet, simply displaying the trademark on a web page not owned by the trademark owner satisfies the Lanham Act's "use in commerce" requirement. *Planned Parenthood Fed. of Am., Inc. v. Bucci*, No. 97-cv-629-KMW, 1997 WL 133313, at *3 (S.D.N.Y. Mar. 4, 1997), *aff'd* 152 F.3d 920 (2d Cir. 1998) ("The nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement."); *Utah Lighthouse Ministry v. Foundation for Apologetic Info. and Research*, 527 F.3d 1045, 1054 (10th Cir. 2008) ("We agree that the Internet is generally an instrumentality of interstate commerce, . . . and thus that the jurisdiction of the Lanham Act constitutionally extends to unauthorized uses of trademarks on the Internet."); *Transamerica Corp. v. Moniker Online Servs., LLC*, 672 F. Supp. 2d 1353, 1362 (S. D. Fla. 2009) ("[T]he use of a trademark to draw consumers to a particular website not belonging to the trademark holder constitutes use in commerce under the Lanham Act.").

###### ii.    Likelihood of confusion

The last element for trademark infringement requires a plaintiff to plead and prove that a defendant's infringement of a protectable trademark is likely to cause confusion to consumers. The Fourth Circuit has identified seven factors as relevant to

whether a likelihood of confusion exists: "(1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use in their businesses; (5) the similarity of the advertising the two parties use; (6) the defendant's intent; and (7) actual confusion." *Lone Star,* 43 F.3d at 933. Plaintiffs need not satisfy all these factors to demonstrate a likelihood of confusion, but the first factor is particularly important to assessing whether there is confusion. *Pizzerio Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984). As explained below, the facts alleged by Plaintiffs satisfy the likelihood-of-confusion requirement.

When assessing the strength or distinctiveness of a mark, the court must look to both the "conceptual" and "commercial" strength of the mark. *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 461 (D. Md. 2002); *World Gym Licensing Ltd. v. Fitness World, Inc.*, 47 F. Supp. 2d 614, 621-22 (D. Md. 1999). Conceptual strength is assessed by placing the trademark on the spectrum in ascending order of strength or distinctiveness: generic, descriptive, suggestive, and arbitrary or fanciful. *Pizzerio Uno*, 747 F.2d at 1527 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)). "Arbitrary" marks are those that comprise "words, symbols, pictures, etc. that are in common linguistic use but which, when used with the goods or services issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." *World Gym Licensing*, 47 F. Supp. 2d at 622.

The words "HINCKLEY" and "MORRIS" and the accompanying logos do not intrinsically describe anything relating to the yacht industry. The court gives "due regard to the determination of the Patent and Trademark Office, which necessarily decides whether a mark is descriptive or suggestive in its decision" to register a mark. *Lone Star*,

43 F.3d at 934. Therefore, the Court concludes that Plaintiffs have sufficiently alleged that "HINCKLEY" and "MORRIS" are "arbitrary" trademarks. Plaintiff's have also plausibly alleged the second prong for strength or distinctiveness of the mark—the commercial strength of the mark. Plaintiffs argue that "the Hinckley and Morris Marks are strong and distinctive, and have been used in connection with their goods and services for more than 90 and 40 years, respectively." ECF No. 27 at 17. Plaintiffs also argue that they "have collectively spent millions of dollars over the years to promote and advertise their products and services under the trademarks and those promotional efforts, combined with substantial sales and revenues have resulted in the marks becoming widely recognized, and thus commercially strong." *Id.* For these reasons, Plaintiffs have adequately alleged facts satisfying the "the strength or distinctiveness of the mark" element of their trademark infringement claim.

The "similarity of the two marks," "similarity of the goods and services," "similarity of the facilities," and "similarity of the advertising" factors all weigh in Plaintiffs' favor too. Plaintiffs allege and provide exhibits demonstrating that Classic Sailboats has used Hinckley's Trademarks and Morris's Trademarks exactly, with little to no modification. *Id.*; *see Lone Star*, 43 F.3d (holding that "Lone Star Grill" and "Lone Star Café" are sufficiently similar marks). Plaintiffs sell and repair vessels, Plaintiffs also sell apparel, and Classic Sailboats has purported to sell water bottles and t-shirts. *Id.* at 17-18; Am. Compl. ¶¶ 42(a), 43, 49, 102. *See Radiance Foundation, Inc. v. NAACP*, 25 F. Supp. 3d 865 (E.D. Va. 2014), *vacated on other grounds*, 786 F.3d 316 (4th Cir. 2015) (holding that, when the marks were identical, there was sufficient proximity of the goods and services offered even if the products were only tangentially related). And Plaintiffs promote their services and goods on their websites and social media pages on the

Internet, as well as through attending local boat shows in the Maryland area. ECF No. 27 at 18. Classic Sailboats utilized the same channels (the Internet and boat shows) to use Hinckley's Trademarks and Morris's Trademarks to spread misinformation and sell products. *Id.*

As to Defendants' "intent," "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Pizzeria Uno*, 747 F.2d at 1535. Plaintiffs have plainly alleged that Classic Sailboats operated with bad faith to confuse the public based on its use of the protected trademarks. Classic Sailboats made several websites and Facebook pages that are extremely similar in name to Plaintiffs' websites, presumably to confuse consumers as to whether they were viewing on of Plaintiffs' websites. Indeed, Plaintiffs have alleged that Classic Sailboats intentionally exploited the good will of Plaintiffs by creating web pages bearing Hinckley's Trademarks and Morris's Trademarks to spread misinformation and sell apparel. Am. Compl. ¶¶ 38-48.

Lastly, when considering actual confusion, Plaintiffs need not *prove* actual confusion at this stage. *See Lone Star*, 43 F.3d at 933. At the pleadings stage, the Court finds Plaintiffs' allegations sufficient that, based on the above factors, consumers have been confused by the infringing websites. ECF No. 27 at 18-19.

### iii.    Remedy

In moving for a default judgment on Count 1, Plaintiffs request relief in the form of an injunction. *Se* ECF No. 62-3 ¶ B. Because Plaintiffs have stated a claim for trademark infringement, this Court may grant an injunction to "serve the public interest

by preventing future consumers from being misled." *Lone Star*, 43 F.3d at 939 (citing *AMP Inc. v. Foy*, 540 F.2d 1181, 1184-85 (4th Cir. 1976)). To be granted an injunction, a plaintiff must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Here, as explained above, Plaintiffs here have more than adequately alleged that Classic Sailboats' various websites and social media pages have an actual impact on Plaintiffs' goodwill and reputation that monetary damages cannot remedy. Am. Compl. ¶¶ 55, 59.

Duplessie raises three reasons, purportedly on behalf of himself and Classic Sailboats, why the trademark infringement claim should be dismissed. Although, as noted above, the entity defendants cannot appear *pro se*, the Court addresses why the arguments Duplessie has raised do not undermine entry of default judgment against the entity defendants.

First, Duplessie argues that any use of Plaintiffs' trademarks was descriptive and non-commercial. ECF No. 49 at 3. As explained above, Plaintiffs have sufficiently alleged that Duplessie's and/or Classic Sailboats' use of Hinckley's Trademarks and Morris's Trademarks satisfies the "use in commerce" requirement of the Lanham Act.

Second, Duplessie argues that no likelihood of confusion exists because his statements "were expressly aimed at identifying issues with the plaintiff's product (the vessel), not at misleading consumers or profiting from the trademark." ECF No. 49 at 3.

As explained above, Plaintiffs have sufficiently alleged that a likelihood of confusion exists that would satisfy the requirements for a trademark infringement claim.

Lastly, Duplessie argues that his use of the trademarks is protected by the First Amendment. ECF No. 49 at 3. But "trademark law generally prevails over the First Amendment when another's trademark (or a confusingly similar mark) is used without permission as a means of source identification." *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140, 159 (2023) (cleaned up). The Supreme Court expressly noted that the likelihood of confusion analysis "does enough work to account for the interest in free expression." *Id.*

Therefore, this Court finds that Plaintiffs have alleged facts sufficient to state a claim for trademark infringement in violation of the Lanham Act, and grants injunctive relief against Classic Sailboats pursuant to Plaintiffs' requests in the motion for default judgment. ECF No. 27-1 at 20-21.

B.    **Count V (Cybersquatting)**

Under the Anticybersquatting Consumer Protection Act ("ACPA"):

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and (ii) registers, traffics in, or uses a domain name that . . . (III) is a trademark, word, or name protected [by other Sections].

15 U.S.C. 1125(d)(1)(A); *see also Under Armour, Inc. v. Exclusive Innovations, Inc.*, 20-cv-3427-SAG, 2021 WL 2042320, at *5 (D. Md. May 21, 2021) ("To establish cybersquatting, a plaintiff must show (1) that the defendant had a bad faith intent to profit from using the plaintiff's mark and (2) that the defendant registered, trafficked, or

used a domain name that is either confusingly similar or dilutive of the plaintiff's mark.").

Section 1125(d) sets out nine non-exhaustive factors for determining whether a person has bad faith intent to profit from a mark:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

*Id.* § 1125(d)(1)(B)(i).

Here, Plaintiffs have adequately alleged that Classic Sailboats is liable for cybersquatting under the ACPA.

First, Plaintiffs have alleged that the domain names registered and used by Classic Sailboats ("hinckleyboat.com," "hinckley-picnicboat.com," "hinckley-sailboat.com," "hinckley-yachts.com," "hinckley-talaria.com," "hinckleysilentjet.com," and "morrisyacht.com") are all identical or confusingly similar to Hinckley's Trademarks and Morris's Trademarks, of which most are federally registered. ECF No. 27 at 22.

Second, Plaintiffs have alleged bad faith on behalf of Classic Sailboats. Classic Sailboats does not appear to use its own name or any similar name to identify any of the domain names or goods or services sold. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(III), (VI). Moreover, as explained above, *supra* Section II.a.5, Plaintiffs have alleged that Classic Sailboats has actual intent to confuse consumers into thinking these web pages are owned by Plaintiffs, thereby benefitting from the goodwill cultivated by Plaintiffs. *Id.* § 1125(d)(1)(B)(i)(V). Most notably, as explained in the paragraph above, Classic Sailboats has registered multiple domain names that are confusingly similar to Plaintiffs' own websites. *Id.* § 1125(d)(1)(B)(i)(VII). Weighing these factors, Plaintiffs have adequately alleged that Classic Sailboats had a bad faith intent to register domain names that are plainly protected by Plaintiffs' various registered trademarks.

Duplessie does not raise any arguments (on behalf of himself or Classic Sailboats) suggesting that this Court should deny this claim at this time, and to the extent these arguments are intertwined with ones he raised in response to Count I of the amended complaint, the Court is similarly unpersuaded.

Because Classic Sailboats is liable for cybersquatting, the court shall grant injunctive relief, pursuant to 15 U.S.C. § 1125(d)(1)(C), that Classic Sailboats transfer the various infringing domain names provided in the motion for default judgment to Plaintiffs. ECF No. 27 at 23-24.

In addition, Plaintiffs have requested an award of statutory damages "in the amount of not less than $1000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). The purpose of statutory damages for cybersquatting is to "discourage wrongful conduct." *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 442 (4th Cir. 2011) (quoting *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 278 (5th Cir. 2002)). In determining the amount of statutory damages, courts "weigh the seriousness of the conduct," *id.*, and "generally 'reserve the high-end of the $1,000 to $100,000 range for the most egregious offenders." *Original Dells, Inc. v. Soul 1 Entertainment Grp.*, 23-cv-0095-TDC, 2024 WL 4052818, at *15 (D. Md. Sep. 5, 2024) (awarding $100,000 in statutory damages per website) (quoting *Newport News Holdings Corp. v. Virtual City Vision, Inc.* No. 08-cv-19, 2009 WL 10689694, at *5 (E.D. Va. July 24, 2009), *aff'd*, 650 F.3d 423). Therefore, this Court must consider whether Defendants' conduct is "exceptional and egregious." *Id.*; *see also Int'l Bancorp, L.L.C. v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 192 F. Supp. 2d 467, 490 (E.D. Va. 2002) ("[C]ourts reserve the high-end of the $1,000 to $100,000 range for the most egregious offenders.").

Here, as alleged by Plaintiffs, Classic Sailboats created seven websites that render it liable for cybersquatting, and Plaintiffs seek $100,000 per domain name, the maximum amount of statutory damages a court may award under the ACPA. ECF No. 27 at 24-25. In *Under Armour, Inc. v. Exclusive Innovations, Inc.*, Judge Gallagher

declined to award the maximum available damages when plaintiffs in that case had

failed to show that the defendants had highly profited from the domain names or that

plaintiffs had lost significant revenue based on defendants' conduct. No. 20-cv-3427-

SAG, 2021 WL 2042320, at *7 (D. Md. May 21, 2021) (awarding $20,000 in statutory

damages per website).

Because Plaintiffs have not shown that Classic Sailboats has necessarily profited

from engaging in cybersquatting, the Court awards $30,000 in statutory damages per

infringing website, for a total of $210,000 in statutory damages.

C.    **Count VII (Breach of Contract)**

The contract for Plaintiffs to repair and store the Vessel is a maritime contract

governed by federal admiralty law. *South Carolina State Ports Authority v. Silver

Anchor, S.A.*, 23 F.3d 842, 846 n.3 (4th Cir. 1994). To recover for breach of a maritime

contract, Plaintiffs must plead and prove "(1) the terms of the maritime contract; (2)

that the contract was breached; and (3) the reasonable value of purported damages." *FE

Partners, LLC v. Chesapeake Boat Works, LLC*, No. 16-cv-188, 2017 WL 11743721, at *3

(E.D. Va. Aug. 31, 2017) (citing *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d

1242, 1249 (11th Cir. 2005)).

Plaintiffs have clearly alleged that Bayshore Management breached its contract.

Bayshore Management entered into a contract for Plaintiffs to perform repair and

storage services. Am. Compl. ¶¶ 82-83. Plaintiffs completed their services in a timely

manner and Bayshore Management was properly invoiced for the total amount;

Bayshore Management stopped paying; and Plaintiffs continued to give notice to

Bayshore Management of the outstanding balance. *Id.* ¶¶ 84-86.

Duplessie's primary arguments (purportedly on behalf of himself and Bayshore Management) in response to the breach of contract claim are that (1) he is not the owner of the Vessel in question, and is therefore not the party that owes Plaintiffs the outstanding balance, and (2) that in any event, Plaintiffs invoiced and billed for services that were either never performed or were conducted inadequately, resulting in safety violations and incomplete repairs on the Vessel. ECF No. 69 at 2; ECF No. 60 at 2. As to the claims against Duplessie, those contentions will be tested in discovery. For current purposes, the question is whether Plaintiffs have satisfactorily *alleged* that Bayshore breached the contract. It has, and Bayshore has defaulted. Therefore, this Court finds Bayshore Management liable for breach of contract and awards consequential damages to the amount of $116,762 to be paid to Plaintiffs.[7]

Plaintiffs also request pre-judgment interest pursuant to Md. Code Ann., Cts & Jud. Proc. § 11-107. ECF No. 27 at 14. Although Plaintiffs' breach-of-contract claim is governed by federal admiralty law (rather than state law), courts have found that pre-judgment interest should generally be awarded in admiralty claims, and that the trial court has discretion to set the exact interest rate, which courts often borrow from state law. *See Newport News Shipbuilding & Drydock Co. v. U.S.*, 226 F.2d 137, 143 (4th Cir. 1955) ("In admiralty the allowance of interest is discretionary."); *OOCL (USA) Inc. v.*

---

[7] It is not clear from the Amended Complaint or Motion for Default Judgment whether Duplessie and Bayshore Management are both parties to the contract, or if Bayshore is the sole contracting party. To the extent both Duplessie and Bayshore are parties to the contract, any potentially meritorious defense that Duplessie has proffered on the breach of contract claim, *see supra* Analysis I.a, applies to him only. That defense does not extend to Bayshore, for reasons stated above, *see supra* n.1, and therefore this Court solely considers Plaintiffs' allegations against Bayshore in granting default judgment for breach of contract.

*Transco Shipping Corp.*, No. 13-cv-5418, 2015 WL 9460565, at *7 (S.D.N.Y. Dec. 23, 2015) ("The Second Circuit has recognized that prejudgment interest should be awarded in admiralty cases absent exceptional circumstances and that calculating prejudgment interest is within 'the broad discretion of the district court.'") (citing *Mentor Ins. Co. (U.K.) v. Brannkasse*, 996 F.2d 506, 520 (2d Cir. 1993)); *Ryan Walsh Stevedoring Co., Inc. v. James Marine Servs., Inc.*, 792 F.2d 489, 492 (5th Cir. 1986); *Todd Shipyards Corp. v. Auto Transp., S.A.*, 763 F.2d 745, 753 (5th Cir. 1985) (affirming use of state-law interest rate to award prejudgment interest).

Accordingly, the Court will award pre-judgment interest pursuant to Maryland law, which provides that the "legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment." Md. Code Ann., Cts & Jud. Proc. § 11-107; *Buxton v. Buxton*, 363 Md. 634, 656 (2001) (explaining that "[p]re-judgment interest is allowable as matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment.'"). Here, Plaintiffs have sufficiently pled that the amount owed was "certain, definite, and liquidated." ECF No. 27 at 14-15. The Court understands the operative date at which interest shall accrue to be October 8, 2021. ECF No. 27-2 at 1-2. Therefore, Bayshore shall also owe Plaintiffs pre-judgment interest in the amount of $36,974.63.

### D.    **Count XI (Defamation)**

Under Maryland law, a common-law defamation claim entails four elements: "that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm." *Crowley v. Fox Broadcasting Co.*, 851 F. Supp. 700, 702 (D. Md. 1994) (quoting *Rosenberg v. Helinski*, 328 Md. 664, 675 (Md. 1992)).

Maryland courts distinguish between two types of defamation: defamation *per se* and defamation *per quod*. *Samuels v. Tschechtelin*, 135 Md. App. 483, 549 (Md. 2000). Defamatory statements qualify as defamation *per se* if "their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice." *Id.* For example, and relevant here, Maryland courts have held that "words which falsely charge a person with or impute to him the commission of a crime for which he is liable to be prosecuted and punished are actionable *per se*." *American Stores Co. v. Byrd*, 229 Md. 5, 13 (Md. Ct. App. 1962). And a statement that "disparages the business reputation of a plaintiff is one of the categories traditionally considered to be defamation *per se*." *S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 843 (D. Md. 2005). When a statement is defamation *per se*, "damages are presumed when a plaintiff can demonstrate actual malice, by clear and convincing evidence, even in the absence of proof of harm." *Samuels*, 135 Md. App. at 549-50. "Actual malice" means the defendant "published the statement in issue either with reckless disregard for its truth or with actual knowledge of its falsity." *Id.* at 544 (quoting *Shapiro v. Massengill*, 105 Md. App. 743, 772 (1995)).

Here, Plaintiffs have plausibly alleged that Classic Sailboats has made numerous false statements on its social media pages and websites that qualify for defamation *per se*, such as that Hinckley boats are "Putting Lives at Risk," that Hinckley is engaged in fraud, and that Hinckley boats will lead people to die, or that investors in Morris are guilty of war crimes. ECF No. 27 at 27; Am. Compl. ¶¶ 39-49. Many of these statements are accompanied by photographs of bloodied dead bodies, boats on fire, and other disparaging imagery that Plaintiffs allege shows that Classic Sailboats acted, with malice, to expose Plaintiffs "to public scorn, hatred, contempt or ridicule, thereby

discouraging others in the community from having a good opinion" of Plaintiffs. *Carter v. Aramark Sports & Ent. Servs., Inc.*, 153 Md. App. 210, 238 (2003). Classic Sailboats has also allegedly sent mass emails to actual or potential customers of Plaintiffs suggesting that the boats are unsafe and that the investors of Plaintiffs committed war crimes and used "blood money" to invest in Plaintiffs. ECF No. 27 at 28; Am. Compl. ¶¶ 44-48. These statements are *per se* defamatory of the investors of Plaintiffs, who are "in direct relation to the trade or business of [Plaintiffs]." *Novick v. Hearst Corp.*, 278 F. Supp. 277, 280 (D. Md. 1968).

In his various motions to dismiss and other briefings, Duplessie makes three primary arguments (purportedly on behalf of himself and Classic Sailboats) in response to the defamation claim: (1) Plaintiffs did not plead actual malice, (2) Duplessie's statements are either true or protectable opinion statements, and (3) Plaintiffs failed to identify specific defamatory statements. ECF No. 49 at 2.

The Court is unpersuaded by these arguments. There is no indication in the record that Plaintiffs constitute "public figures" for defamation purposes, and thus actual malice is not an element of Plaintiffs' claim. *See, e.g.*, *Shapiro*, 105 Md. App. at 772. But even if Plaintiffs are "public figures" such that they would need to plead and prove "actual malice," the complaint more than adequately alleges that Defendants "published the statement[s] in issue either with reckless disregard for [their] truth or with actual knowledge of [their] falsity." *See Samuels*, 135 Md. App. at 549-50; Am. Compl. ¶¶ 38-50, 104. And Plaintiffs have identified several quoted statements, taken directly from the web pages and social media sites, that can be construed as defamatory. *See* Am. Compl. ¶¶ 39-49; ECF No. 27 at 27.

The Court thereby holds that Plaintiffs have alleged facts sufficient to state a claim for defamation. While monetary damages are the usual remedy for defamation, whether a plaintiff may obtain an injunction enjoining a defaming defendant from repeating the defamatory speech depends on whether (1) a plaintiff has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) a remedy in equity is warranted considering the balance of hardships between the plaintiff and defendant; and (4) the public interest would be served by a permanent injunction. *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (citing *eBay Inc.*, 547 U.S. at 391).

Plaintiffs have alleged that they have suffered an irreparable injury as a result of Classic Sailboats' use of multiple websites and intentional outreach to Plaintiffs' customers and the general public. ECF No. 27-1 at 29. Specifically, Plaintiffs have alleged they have suffered the irreparable injury of "threatened loss of good will," a loss that is difficult to quantify or rectify through monetary damages. *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 335 (S.D.N.Y. 2011) (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)). Plaintiffs have also alleged that, because Classic Sailboats is a limited company based in Nevis, this may pose a barrier to collecting monetary damages such that the Court should instead grant injunctive relief. ECF No. 27-1 at 30.

Plaintiffs have further alleged that an injunction is warranted due to the particular crudeness on the part of Defendants to "post photographs of dead bodies in an effort to underscore their false accusations of criminal actions by alleged company investors," while using "multiple domain names confusingly similar to [Plaintiff's]" as part of "an escalating strategy of belligerence." *Id.* Lastly, Plaintiffs have sufficiently

alleged that the public interest would be served by an injunction, given that Classic Sailboats' statements "serve no public purpose" and instead "do nothing but confuse and mislead the public." *Id.*

Therefore, in lieu of granting damages, the Court will enjoin Classic Sailboats, as explained in the accompanying Order, from publishing knowingly false, defamatory statements regarding Plaintiffs.

III.    **Motions to Dismiss the Complaint**

As noted above, two of the motions Duplessie has filed are motions to dismiss. ECF Nos. 49, 60.

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleadings must contain sufficient factual allegations to state a facially plausible claim for relief. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As noted above, when considering such a motion, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212.

The Court's analysis in considering Duplessie's motions to dismiss largely mirrors the analysis with which it granted Plaintiffs' motion for default judgment

against Classic Sailboats and Bayshore. *See supra* Section II (addressing Duplessie's arguments). For the reasons stated above, Plaintiffs have stated claims for trademark infringement, cybersquatting, breach of contract, and defamation, and Duplessie's motions to dismiss will be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for default judgment, ECF No. 27, is granted in part and denied in part. Defendant's motion to vacate the entry of default, ECF No. 59, is granted, and Defendant's motions to dismiss, ECF Nos. 49, 60, are denied. Plaintiffs' motion to strike the answers, ECF No. 67, is granted in part (insofar as the answers purported to be filed on behalf of Bayshore and Classic Sailboats) and denied in part as moot (in light of the default against Duplessie personally being vacated). All other pending motions are denied. A separate order follows.

Date:  December 20, 2024

_____
Adam B. Abelson
United States District Judge